STATE OF CONNECTICUT *v.* VICTOR L. JORDAN, SR.
(AC 32123)

Lavine, Sheldon and Bishop, Js.

Argued January 18—officially released May 22, 2012

*Pamela S. Nagy,* special public defender, for the appellant (defendant).

*Timothy J. Sugrue,* assistant state's attorney, with whom, on the brief, were *Maureen Platt,* state's attorney, and *Terence D. Mariani, Jr.,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Victor L. Jordan, Sr., appeals from the judgment of conviction of attempt to commit robbery in the third degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-136, conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 and 53a-136, and tampering with physical evidence in violation of General Statutes

§ 53a-155.[1] On appeal, the defendant claims that (1) the court improperly admitted evidence of prior misconduct, (2) there was insufficient evidence to support the tampering conviction, (3) there was insufficient evidence to support the conviction of attempt to commit robbery in the third degree and conspiracy to commit robbery in the third degree, (4) he was deprived of a fair trial due to prosecutorial impropriety and (5) the court improperly enhanced his sentence under General Statutes § 53a-40b. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 1, 2008, Tannith McDonnell, the assistant manager of the Naugatuck Savings Bank located at 565 Straits Turnpike in Watertown, met an acquaintance, Patsy Lombardi, in the bank parking lot at approximately 4 p.m. after she had locked the bank's doors for the day. While seated in Lombardi's car, she observed a man approach the bank who was wearing a heavy black coat with a raised hood, a camouflage ski mask, dark jeans and black gloves.[2] The man placed a gloved hand inside his pocket and pulled "aggressively" on the bank door with the other hand. When the locked door would not open, the man walked back down the sidewalk and out of sight. McDonnell waited until the man cleared the corner and then used Lombardi's cell phone to call 911 and report her observations to the police. Watertown police Officer Jeffrey McKirryher, who was on duty nearby directing traffic, received McDonnell's report over his police radio. McKirryher immediately saw a likely suspect and when he called out to him, the man took off, running.

---

[1] The defendant also was charged in a part B information with committing these offenses while on release in violation of General Statutes § 53a-40b as well as being a persistent serious felony offender in violation of General Statutes § 53a-40 (c).

[2] Lombardi provided the same description of the man.

McKirryher chased the suspect onto Birch Meadow Drive, a nearby cul-de-sac, where he saw a tan vehicle with two distinctive black doors parked at the end of the road. The suspect made brief contact with the operator of the tan vehicle and then ran into a wooded area. As the car was driven away, McKirryher broadcast his observations over his police radio. Shortly thereafter, Watertown police Detective David Bromley heard the report, saw the tan car and pursued it until it came to a halt at a police roadblock.

Virginia Palmer was on Birch Meadow Drive walking her dog when she saw a light-skinned black or Hispanic man in a dark jacket running up her street while being chased by police. Palmer observed that the fleeing man was wearing a telephone earpiece, and she heard him say, "[M]eet me on the other street, meet me on the other street." The man then ran into the wooded area at the top of the street. Gerald Boudreau was home on Birch Meadow Drive that afternoon and saw a black man wearing dark clothes and sunglasses run across his backyard while removing his jacket and running toward Sprucewood Road.

Katherine Desantis, who lived on Sprucewood Road, which runs parallel to Birch Meadow Drive, saw a black man wearing a dark jacket, dark jeans and a dark colored "do-rag" on his head, run from behind a neighbor's house. She noted that the man kept looking behind him as if he was being pursued. While the man was in the middle of the street, she saw the man remove his jacket, revealing its bright colored lining. Desantis telephoned the police as the man was in her neighbor's yard, looking around. Desantis next saw the man in her own backyard removing his gray sweatshirt and then going around to the back of her carport.[3] Desantis' husband, Dennis

---

[3] Desantis testified that she was sure that the man she saw in her backyard was black, but she was unable to identify him. She further testified that the defendant's skin tone and that of the man she saw were consistent.

Desantis, arrived home shortly after the police had left and located a sweatshirt "crumpled up in a ball" at the far side of the carport. Two days later, Katherine Desantis located a dark jacket with a bright red-orange lining in a neighbor's trash can. The police collected the gray sweatshirt and the dark jacket from the Desantises. When removing the jacket from the trash can, the police also discovered a "black fabric type item"; a "neoprene-like fabric mask" that was black on one side and camouflaged on the other; a pair of black leather gloves; and a "small, black plastic . . . shopping bag."

The tan automobile with two black doors that was halted by the police at the roadblock was an Infiniti sedan registered to the defendant.[4] The lone occupant and operator of the vehicle was Herman Cordero. Cordero testified that he fixed cars for a living and that he had been working on the defendant's car at a nearby Super 8 Motel on the day of the incident. He stated that, because he needed more tools, he decided to get some from his house. Cordero testified that he drove the defendant's Infiniti, with the defendant as a passenger, to retrieve the tools and that on the way the defendant asked him to pull over in the LaBonne's Supermarket parking lot. LaBonne's Supermarket and Naugatuck Savings Bank are on opposite ends of the same parking lot. The defendant gave no reason for wanting to alight from the car, but simply stated that he would be back in a few minutes. Cordero claimed that because it took the defendant longer to return than he had expected, he decided to continue to his home to retrieve the tools and then return to the parking lot for the defendant. Once en route, however, he changed his mind about driving alone to his home because he

[4] When the police searched the Infiniti, they found motor vehicle documents that identified the car as being registered to the defendant. Other motor vehicle documents found in the Infiniti identified the defendant as the registered owner of a 1992 Chevrolet Blazer.

did not want the defendant to think he was stealing his car. Accordingly, he claimed, he pulled into a cul-de-sac for a few minutes to wait. He stated that it was just a coincidence that he stopped in the cul-de-sac that the fleeing suspect had used as an escape route. Although the police discovered three cell phones in the Infiniti pursuant to a search warrant, Cordero denied making any contact with the suspect between the time he dropped him off at the parking lot and his confrontation with the police.

One of the cell phones discovered by the police led them to Jennifer Campbell, a woman who was romantically involved with the defendant. Campbell testified that the defendant called her at about 8 p.m. on April 1, 2008, and said that he needed help. He asked her to meet him at the Super 8 Motel where, he said, he was going by taxicab and where he would be with his wife and children. Campbell testified that when she arrived at the motel, the defendant asked her to rent a room in her name, and he provided her with money for the cost of the room. According to Campbell, after settling into the room with her, the defendant attempted multiple times to call a person named "Jun," but he could not reach him. Although she knew who Jun was, she did not learn that his real name was Herman Cordero until after she was arrested. Campbell testified that she had seen the defendant and Cordero, whom she knew as Jun, together "[v]ery many" times, and she described the two men as "[v]ery tight . . . very close."

While the defendant and Campbell were in the motel room, the defendant expressed concern that "they're" going to connect him and her together because his iPhone, left in the car, contained her first and last name in its directory. Campbell stated that when she asked the defendant who "they" were, the defendant avoided answering the question. After some further discussion, Campbell called Eric Pearson to ask that he rent a

separate room for the defendant. Thereafter, Campbell drove to her home in Bristol to retrieve clothing for the defendant because his jeans were muddy and he was wet and cold. Campbell testified that when she returned with the clothing and asked the defendant why he was wet, he replied that he was going to "commit a heist" in Watertown but the building was closed, and that the police had chased him through a muddy wooded area, believing that he was the person who had been spotted wearing a mask in the vicinity of the bank.

Campbell also testified that on April 2, 2008, the defendant asked her for a ride to court in Bridgeport. Campbell agreed and drove to Waterbury in her burgundy Buick LeSabre where she picked up the defendant at a 7-11 store. She drove the. defendant to the Super 8 Motel, where, she claimed, he got "very excited" and told her to "[k]eep going, get out of there, we got to get out of here." She testified that she believed the defendant was excited as a result of seeing Detectives David McKnight and Michael Ponzillo of the Waterbury police department speaking with the defendant's wife at the Super 8 Motel. In his testimony, McKnight stated that he saw a red Buick in the parking lot, recognized the defendant as its front seat passenger and locked eyes with him. McKnight testified that after he saw the defendant motion the Buick's operator to keep moving, the car took off at a high rate of speed.

Later in the day, after Campbell received cell phone messages that Waterbury detectives wanted to speak with her, the defendant drove her to the police station. According to Campbell, although she initially was uncooperative, she eventually agreed to help the police try to lure the defendant to a place where he could be apprehended. That effort, however, proved unsuccessful.

On April 16, 2008, the police tracked the defendant to a residence on Congress Avenue in Watertown,

where he was found hiding in a closet. The defendant refused to comply with the commands of the police to submit to arrest. Instead, he was removed from the residence by force and taken into custody.

The items of clothing and apparel seized by the police from the Desantises' neighbor's trash can were submitted to the state forensic laboratory for DNA analysis with the result that the defendant was included as a contributor in each sample except one. The lone exception was the mixture extracted from the collar of the jacket. As to this sample, the police concluded only that the defendant could not be eliminated as a contributor.

Following the police investigation, the defendant was charged by information with the following offenses: count one, attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (4); count two, conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134; count three, attempt to commit larceny in the second degree in violation of §§ 53a-49 (a) (2) and 53a-123 (a) (3); count four, conspiracy to commit larceny in the second degree in violation of §§ 53a-48 and 53a-123 (a) (3); and count five, tampering with physical evidence in violation of § 53a-155.

At the conclusion of its case-in-chief in the defendant's jury trial, the state conceded that the evidence was insufficient to find the defendant guilty of attempt to commit and conspiracy to commit robbery in the first degree. The parties agreed, however, that sufficient evidence existed to find the defendant guilty of the lesser offenses of attempt to commit and conspiracy to commit robbery in the third degree. Accordingly, the trial court rendered judgment of acquittal on the charged offenses relating to robbery in the first degree and expressed its intention to submit the lesser inchoate offenses to the jury. The court also rendered judgment

of acquittal on the counts charging the defendant with attempt to commit and conspiracy to commit larceny in the second degree.

Thereafter, the state filed an amended information that conformed to the court's rulings, and the jury found the defendant guilty as charged in the amended information. As noted, the defendant also had been charged in a part B information with committing each of the charged offenses while on pretrial release in violation of § 53a-40b and with being a persistent serious felony offender in violation of General Statutes § 53a-40 (c). The defendant elected that the part B charges be tried to the court. Following an evidentiary hearing, the court found the defendant guilty as charged in part B of the amended information. The court thereafter imposed a total effective sentence of thirty years imprisonment, to be served consecutively to any sentence the defendant was then serving. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim is that the court abused its discretion when it admitted evidence of prior misconduct for the limited purpose of proving the defendant's criminal intent. More specifically, the defendant argues that the court abused its discretion in admitting the prior misconduct evidence because (1) the jury could not reasonably conclude that the defendant had committed the prior misconduct and (2) the prejudicial impact outweighed its probative value. The defendant further contends that the error was harmful and, therefore, mandates a reversal of the judgment of conviction. We disagree.

The following additional facts are relevant to this claim. During trial, the state sought to admit evidence of prior misconduct by the defendant by adducing evidence relating to a March 31, 2008 robbery of People's

United Bank in Bethel, for which the defendant had been arrested and faced prosecution. At a hearing concerning the admissibility of this prior misconduct evidence, the state argued that the evidence of the Bethel robbery was relevant to prove the defendant's criminal intent when he approached and attempted to open the rear door of the Naugatuck Savings Bank. Although the defendant admitted that such evidence probably showed a criminal intent, he claimed that "the cumulative weight of that evidence would be prejudicial . . . ."[5] He also argued that unlike most uncharged misconduct cases in which the identity of the defendant as the person who committed the prior misconduct is not at issue, it had not been proven that the defendant was the person who had robbed the Bethel bank. Therefore, the defendant claimed, "there is going to be, actually, two robbery trials going on . . . ."[6] The defendant also objected to the admission of the misconduct evidence on the grounds that it would "water down" his presumption of innocence in the present case, that the evidence amounted to "evidentiary overkill" on the issue of intent and that the prior misconduct evidence would confuse the jury because "a reasonableness standard" would be applicable in determining whether the

---

[5] At the hearing, defense counsel stated: "As far as the facts of the Bethel case, I mean, if this were a motion to consolidate the two cases I would probably have to agree with the state that the evidence would tend to show whoever committed the Bethel robbery also committed the attempted robbery [in Watertown].

"I'm not contesting the acts or the similarity between the two; that speaks for itself. My argument still, kind of, remains the same as it was earlier, where, in essence, what we have is, we have a full—two robbery cases. And the state is using the Bethel case, as it says, to show intent. Which I intend—intend to agree it probably would show intent. But I think the cumulative weight of that evidence would be prejudicial . . . ."

[6] The court previously had noted that "[there is] no issue here of presumption of innocence in the Bethel case because . . . a ruling that the misconduct evidence is admissible here does not in any way determine the outcome of the Bethel case, which will be tried . . . by a separate jury in a separate court."

defendant had committed the Bethel robbery, while "the reasonable doubt standard" applied in determining whether the defendant committed the attempted robbery in the case at hand.

The court overruled the defendant's objections, ruling that the evidence could be admitted solely for the purpose of proving a criminal intent, on the basis of its finding that "there is evidence from which the jury reasonably could conclude that the defendant actually committed the misconduct in . . . the Bethel incident." The court also found that the admission of this prior misconduct evidence would not have the effect of diluting the defendant's presumption of innocence or lessening the state's burden of proving his guilt beyond a reasonable doubt. Regarding prejudice, the court stated that "this is not the type of evidence that would inflame the jury's passions or is especially gruesome." It further stated that any unfair prejudice would be minimized by the cautionary instructions it planned to give to the jury.

Over the course of the next two days, the state presented nine witnesses and two videotapes regarding the robbery of the People's United Bank in Bethel. Head bank supervisor Carlos Alverez testified that, on March 31, 2008, as he drove into the parking lot, he almost collided with a masked, hooded man in a dark jacket. He tried to call his branch to report a suspicious looking person outside. When nobody answered, he ran inside to discover that the bank had just been robbed.

Camron Berkner, another Bethel bank teller who was working that day, testified that a man wearing a hoodie, a black mesh mask and black gloves walked into the bank and tossed a black plastic bag over the counter while telling him to empty his drawer. Berkner identified state's exhibits 43 and 44—still photographs taken from interior bank surveillance video—as showing the bright red or orange lining of the robber's jacket.

Clifford Falls, a resident who lived near the Bethel bank, had a video camera installed outside his house for security purposes that pointed out toward the street. Officer Brian Diana secured the videotape from Falls and testified regarding the relevant portion of the video.[7] Michael Libertini, a Bethel police sergeant, testified regarding his response to the bank robbery alarm and his observation of a vehicle that looked like an earlier model Chevrolet Blazer or Ford Explorer being driven away from the direction of the bank. He stated that the vehicle was occupied by two people, one of whom had a bright red color visible in the chest area and both of whom were looking back and forth at one another and at Libertini. Although this sighting aroused Libertini's suspicions, he continued to the bank in response to the alarm. He later viewed the Falls video and thought, but was not certain, that he had seen the vehicle depicted in the video earlier heading away from the bank as he was approaching.

With that factual background, we begin our analysis by addressing the well settled standard of review regarding the defendant's claim that the court incorrectly admitted prior misconduct evidence. "The admission of evidence of . . . uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . To be admissible under the Connecticut Code of Evidence, the uncharged misconduct must be relevant . . . to one of the exceptions . . . to the general bar against uncharged misconduct. . . . If it is relevant to one of the exceptions, then its probative value . . . must be greater than its prejudicial effect. . . . Section 4-5 [of the Connecticut Code

---

[7] The video was admitted into evidence as state's exhibit 47.

of Evidence][8] specifies that uncharged misconduct may be admissible to prove, inter alia, intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Dearborn*, 82 Conn. App. 734, 740–41, 846 A.2d 894, cert. denied, 270 Conn. 904, 853 A.2d 523 (2004). Once one of those requirements has been satisfied, prior misconduct evidence "may be considered by the jury for a proper purpose if there [is] evidence from which the jury reasonably could . . . [conclude] that the prior act of misconduct occurred and that the defendant was the actor." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 321, 977 A.2d 209 (2009); see also *State* v. *Aaron L.*, 272 Conn. 798, 827, 865 A.2d 1135 (2005) ("the trial court only need determine that there is sufficient evidence for the *jury* to find that the defendant committed the prior act" [emphasis in original]).

The defendant first argues that the jury could not reasonably have concluded that the defendant committed the Bethel robbery. More specifically, the defendant contends that the prior misconduct evidence was too inconclusive to render a reliable identification of either the defendant or a particular vehicle. We are not persuaded.

The proper admission of the state's prior misconduct evidence was dependent upon proof from which the

---

[8] Subsection (a) of § 4-5 of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person . . . ."

Subsection (b) of § 4-5 of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

jury "reasonably could have concluded" that the defendant had robbed the Bethel bank.[9] Our review of the record leads us to the conclusion that, on the basis of the evidence produced at trial, the jury reasonably could have drawn that conclusion. The clothes worn by the Bethel robber—a black jacket with a distinctive bright orange liner, a face mask and sunglasses—were very similar in descriptive detail to the items discarded by the defendant on Sprucewood Road while fleeing from the Watertown police. The black plastic shopping bag used by the Bethel robber, which was depicted in the images capturing that robbery, was similar to the black plastic shopping bag the defendant placed in a trash can on Sprucewood Road. Furthermore, the dark-colored vehicle that likely was used by the Bethel robber to flee from the bank, and which was depicted in images captured after the robbery, also matched the description of the defendant's 1992 black Chevrolet Blazer that later was seized by the police at the Super 8 Motel. Finally, the jurors had the opportunity to compare their in-court observations of the defendant with the images of the Bethel robber depicted on the bank surveillance tapes. In sum, this evidence was more than adequate for the jury reasonably to have concluded that the defendant had been the Bethel bank robber. Accordingly, we do not disagree with the court's conclusion that there was sufficient evidence of the defendant's involvement in the Bethel incident for it to be introduced as prior misconduct evidence for the purpose of establishing criminal intent in the present case.

The defendant also argues that the court erred in its resolution of the probative-prejudicial impact balancing

---

[9] It should also be noted that the court provided a limiting instruction that the evidence relating to the Bethel incident could be used only as it related to proving the defendant's intent during the Watertown incident. The defendant makes no claim that this limiting instruction was incorrect; rather, the defendant claims that it was insufficient to overcome the prejudice caused by the admission of the prior misconduct evidence.

test. More specifically, the defendant claims that the probative value of the evidence was minimal because the state had already introduced more than enough evidence to prove intent and, reciprocally, that its prejudicial impact was great. We disagree.

The defendant argues that the probative value of the evidence was slight because the state had already introduced ample evidence to prove intent and that criminal intent was not a contested issue at trial. Contrary to the defendant's assertion, however, the record shows that the element of intent was indeed contested by the defendant, as he argued to the jury that the Bethel incident, which had been proffered as proof of the defendant's intent, did not support a finding of intent to rob because "Bethel was a larceny, not a robbery . . . ." In making this argument, the defendant appears to have been claiming that while the prior misconduct evidence may have been probative as to a general criminal intent, it was not probative as to his specific intent to commit a robbery, an offense that contains the additional element of the use or threatened use of force. Evidence of the Bethel incident, however, was, in fact, probative of an element of the attempted robbery charge concerning the use or threatened use of force.

The circumstances of the Bethel bank incident, particularly as they related to the manner of the defendant's appearance, contributed to the state's proof that the defendant, while attempting to gain entrance to the Watertown bank, had the intent to commit a robbery. In the video of the Bethel incident, the defendant can be seen wearing a face mask and a hoodie pulled over his head partially covering his face, with one hand in his pocket and the other holding onto a bag. When coupled with Campbell's testimony that the defendant had admitted to going to the Watertown bank with the intention of committing a "heist," evidence that the defendant previously had robbed the Bethel bank while

dressed in the same manner as he appeared at the door of the Watertown bank provided context to his behavior at the bank's door, lending support to the state's claim that his conduct at the door of the Watertown bank constituted a substantial step in furtherance of an effort to rob the bank. Moreover, it was the state's obligation to prove all the elements of the charged offense, including that the defendant intended to use or threaten the use of force to commit a larceny upon entering the Watertown bank. Thus, evidence of the Bethel occurrence was relevant to this part of the state's burden of proof regarding the intent to commit a robbery.

The defendant further argues that the similarity of the crimes made the prior misconduct evidence highly prejudicial because the jury would be more likely to view the prior misconduct as propensity evidence. The propensity argument has been made and rejected in similar circumstances. For example, in *State* v. *Amaral*, 179 Conn. 239, 244, 425 A.2d 1293 (1979), our Supreme Court determined that the mere fact that uncharged misconduct and the charged crime are similar does not make the uncharged misconduct evidence unduly prejudicial. Although some prejudice naturally flows from such evidence, the evidence here was not of such a character that it would tend to shock the jury or inflame its passions. The court conducted a full hearing outside the presence of the jury in which it allowed the defendant to argue against the offer of proof and, after considering the parties' arguments, determined that the probative value of the prior misconduct evidence outweighed its prejudicial tendency. Moreover, any prejudice was minimized by the court's limiting instruction to the jury on the proper use of the misconduct evidence.[10] See *State* v. *Lopez*, 14 Conn. App. 536, 539, 541

---

[10] The jury was instructed as follows regarding the evidence of the Bethel incident: "This evidence is being admitted solely . . . to show the defendant's intent at the time of the alleged incident on April 1, 2008, in Watertown. . . . You may consider such evidence if you believe that the prior act of misconduct occurred and that the defendant was the actor, and, further,

A.2d 902 (1988) ("[s]uch a limiting instruction serves to minimize any possible prejudice"); see also *State* v. *Anderson*, 86 Conn. App. 854, 870, 864 A.2d 35 (jury presumed to follow court's instructions absent clear evidence to contrary), cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005). The care with which the court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion.

## II

The defendant next claims that his conviction of tampering with physical evidence in violation of § 53a-155[11] must be vacated because his conduct of discarding his clothing while being chased by a police officer does not fall within the terms of the statute. More specifically, the defendant argues that a police investigation does not constitute an "official proceeding" as discussed in § 53a-155.

find that it logically, rationally and conclusively supports the issue for which it's being offered by the state, namely, the defendant's intent in Watertown on April 1, 2008."

The court further instructed the jurors that, if they did not believe the evidence, or did not find that it logically, rationally and conclusively supported the intent element for which it was being offered, they could not consider the evidence "for any purpose." The court instructed the jurors that the evidence could not be used as proof of the defendant's bad character, or to show any criminal predisposition, tendency or propensity on the defendant's part. Finally, the court reminded the jurors that the state bore the burden of proving every element of each charged offense, including that relating to intent, beyond a reasonable doubt.

The court repeated this instruction both the next day and in its final charge.

[11] General Statutes § 53a-155 provides: "(a) A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding."

"(b) Tampering with or fabricating physical evidence is a class D felony."

In *State* v. *Foreshaw*, 214 Conn. 540, 550–51, 572 A.2d 1006 (1990), our Supreme Court considered this same question and concluded that evidence that the defendant had discarded a weapon while fleeing from the scene of a crime was sufficient to sustain a conviction of tampering with physical evidence, notwithstanding the fact that she discarded the weapon before any "official proceeding" had been instituted. As in *Foreshaw*, the jury in the case at hand reasonably could have considered evidence that the defendant discarded incriminating evidence such as clothes and a mask while fleeing from the police as evidence that he was attempting to prevent its use against him in a subsequent official proceeding. Indeed, it is difficult to conjure up a situation in which a jury could not reasonably conclude that a defendant who discards incriminating evidence while fleeing from the scene of a crime also seeks, by discarding the evidence, to prevent its use against him in a criminal prosecution.

Furthermore, as the defendant acknowledges in his brief, his success in this claim would require us to overrule a Supreme Court decision, a task beyond this court's charter. As an intermediate appellate body, it is axiomatic that this court is "bound by Supreme Court precedent and [is] unable to modify it . . . . [W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 107 Conn. App. 666, 684–85, 946 A.2d 319, cert. denied, 288 Conn. 902, 952 A.2d 811 (2008); see also *State* v. *Brown*, 73 Conn. App. 751, 756, 809 A.2d 546 (2002) ("Our Supreme Court is the ultimate arbiter of the law in this state. We, as an intermediate appellate court, cannot reconsider the decisions of our highest court.").

## III

The defendant's third claim is that his conviction of conspiracy to commit and attempt to commit robbery violated his rights to due process because the state failed to prove that he intended to use or threatened to use force while committing a larceny. We disagree.

At the outset, we note that the defendant conceded, at the postjudgment hearing, that "there was ample evidence" in support of the inference that he had attempted to enter the Watertown bank "with the intent in mind to commit a crime." The issue presented by the defendant is whether such evidence was sufficient, as well, to prove that he had attempted to commit a larceny and that he attempted to do so by the threat or use of physical force as required by §§ 53a-136 and 53a-133.[12]

Due process requires that the state prove each element of an offense beyond a reasonable doubt. *State v. Smith*, 194 Conn. 213, 217, 479 A.2d 814 (1984). It follows that insufficiency of the evidence to support a jury's ultimate findings on each of these elements requires acquittal. See *State v. Carpenter*, 214 Conn. 77, 83–85, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992). Due process does not, however, require that each subordinate conclusion supported by the evidence be proved beyond a reasonable doubt. We regularly have held that

---

[12] General Statutes § 53a-136 (a) provides: "A person is guilty of robbery in the third degree when he commits robbery as defined in section 53a-133."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

a jury's factual inferences that support a guilty verdict need only be reasonable. *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991). Equally well established is the precept that a jury may draw factual inferences on the basis of already inferred facts. *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

A person is guilty of criminal attempt if, acting with the kind of mental state required for the commission of the crime, he intentionally engages in conduct that constitutes a substantial step in a course of conduct planned to culminate in the commission of the crime. See General Statutes § 53a-49; see also *State* v. *Lynch*, 21 Conn. App. 386, 402, 574 A.2d 230 ("[the action] must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted" [internal quotation marks omitted]), cert. denied, 216 Conn. 806, 580 A.2d 63 (1990). "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133.

To prove that a defendant is guilty of robbery, the state must prove that the defendant had the specific intent to commit a larceny and that the larceny was committed through the use or threatened use of force. See General Statutes § 53a-133; see also *State* v. *Lewis*, 245 Conn. 779, 787, 717 A.2d 1140 (1998). "[T]he intent element of robbery relates to the commission of the larceny and not to the use or threatened use of physical

force." (Internal quotation marks omitted.) *State* v. *Blango*, 102 Conn. App. 532, 548, 925 A.2d 1186, cert. denied, 284 Conn. 913, 931 A.2d 932 (2007). Additionally, the specific intent required to prove an attempted robbery is no different from the specific intent required to commit a robbery, as "[i]t is plain from a reading of General Statutes § 53a-49 (a) that the intent required for attempt liability is the intent required for the commission of the substantive crime." (Internal quotation marks omitted.) *State* v. *Zollo*, 36 Conn. App. 718, 734, 654 A.2d 359, cert. denied, 234 Conn. 906, 660 A.2d 859 (1995). Thus, one who has the specific intent to commit a larceny may be found guilty of attempted robbery upon proof that the defendant had the specific intent to take money or property not his own, that the person sought to accomplish the act by the use or threatened use of force and that the person took a substantial step in furtherance of the commission of the crime. The question here, therefore, is whether the state adduced sufficient evidence that the defendant had formulated the intent to commit a larceny at the Watertown bank through the use or threatened use of force and, if so, whether the state proved that the defendant committed any act or omission "constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a) (2). Contrary to the defendant's claim, we believe the evidence adduced at trial supports the inference that the defendant had formulated the intent to commit a robbery through the use or threatened use of force and that the defendant took a substantial step in furtherance of the commission of that robbery.

"While there is no definition of the word threaten in the statutes, General Statutes § 1-1 (a) provides that the commonly approved usage of the language should control. . . . A threat is 1. an indication of something impending and usually undesirable or unpleasant . . .

2. something that by its very nature or relation to another threatens the welfare of the latter. . . . A threat has also been defined as any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free and voluntary action [which] alone constitutes consent." (Citations omitted; internal quotation marks omitted.) *State* v. *Littles*, 31 Conn. App. 47, 54, 623 A.2d 500, cert. denied, 227 Conn. 902, 630 A.2d 72 (1993). "This definition does not require that a threat be explicitly uttered. . . . An implied threat is as effective as a stated threat, especially when the apparent ability to carry out the threat is overwhelming." Id. Furthermore, "[i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances." (Internal quotation marks omitted.) *State* v. *Moore*, 82 Conn. App. 267, 271, 843 A.2d 652, cert. denied, 269 Conn. 904, 852 A.2d 734 (2004).

In this case, on the basis of the evidence produced at trial, it was not unreasonable for the jury to infer that the defendant's intent in seeking to enter the Watertown bank was to demand money by the implicit threat to use physical force if his demand was not met. "Jurors do not live in a fishbowl. . . . In considering the evidence . . . [j]uries are not required to leave common sense at the courtroom door . . . . A threat need not be explicitly uttered." (Citations omitted; internal quotation marks omitted.) *State* v. *Glasper*, 81 Conn. App. 367, 375, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004).

We are mindful, as well, that the jury heard testimony from Campbell that, on the night of the Watertown incident, the defendant told her that he had gone to the Watertown bank earlier that day to "commit a heist." This testimony corroborates the evidence of the defendant's conduct and appearance at the bank's door.

When the defendant approached the Watertown bank he was dressed in clothing that shielded his identity by means of a hood, mask and sunglasses, attire that was very similar to that which he wore during the Bethel robbery where, upon entering the bank, he handed the teller a black plastic bag and demanded money. Thus, on the basis of the evidence of the defendant's dress, his conduct during the Bethel incident, and his proclaimed reason for going to the Watertown bank on the day in question, the jury reasonably could have inferred that the defendant, while at the bank's door, was in the process of seeking entrance to the bank for the purpose of committing a robbery.

Accordingly, viewing the evidence in the light most favorable to sustaining the verdict, we conclude, on the basis of the cumulative evidence presented, including the reasonable inferences to be drawn therefrom, that the evidence adduced at trial was adequate to support the jury's verdict.

## IV

The defendant's fourth claim is that he was denied a fair trial because of the prosecutor's impropriety. Specifically, the defendant claims that the prosecutor violated his right to due process by failing to take steps to correct allegedly false testimony given during the direct and cross-examination of two witnesses for the state. In response, the state argues initially that the defendant waived this claim at trial and that, if the claim is not waived, the prosecutor's failure to cure the witnesses' testimony was not improper. We conclude that the defendant did not waive this claim. We conclude, as well, however, that the prosecutor's failure to correct the errant testimony, though improper, did not deprive the defendant of a fair trial.

The following additional facts are relevant to this claim. Before Cordero testified and outside the presence of the jury, the prosecutor explained to defense

counsel and to the court on the record that he had spoken to Cordero's counsel and that Cordero, who had been charged in connection with the present case, indicated that he may elect to testify for the state. The prosecutor further stated: "[J]ust so the record is clear, what I said to [Cordero's counsel] and what I said to [the defendant's counsel] about [Cordero's] cooperation is that if he testified we would bring his cooperation to the sentencing judge . . . when his case is disposed of. And that's the extent of the agreement."

Thereafter, Cordero appeared in court and testified in the presence of the jury. He admitted that he was currently incarcerated and charged with bank robbery for two separate incidents. Following testimony regarding the events of April 1, 2008, the prosecutor asked: "And what—what were you promised in exchange for testifying here today?" to which Cordero responded, "Nothing." The prosecutor thereafter asked no further questions to clarify the discrepancy between Cordero's answer and representations the prosecutor had made to the court and counsel before Cordero's testimony. On cross-examination the following exchange took place between defense counsel and Cordero:

"[Defense Counsel]: And you indicate you don't expect any kind of benefit from testifying here today?

"[The Witness]: No, sir.

"[Defense Counsel]: Okay. You—you don't expect to get any kind of consideration for your two robbery cases for testifying here today?

"[The Witness]: No, sir.

"[Defense Counsel]: And you've been incarcerated since the date of your arrest. Correct?

"[The Witness]: Yes, sir."

After Cordero had concluded his testimony, and left the witness stand, the prosecutor informed the court that the state's next witness, Campbell, was represented by counsel, and that he needed to speak with her counsel. Thereafter, the prosecutor placed the following information on the record, outside the presence of the jury, but in the defendant's and defense counsel's presence: "The next witness is Jennifer Campbell. And again, as [defense counsel] is aware, she has a pending case. I believe she's charged with hindering prosecution based on [the events relating to the case on trial]. She is represented by attorney Auden Grogins, and [I] made the same representation to her and her client as I did to [attorney Mark Ouellette] and his client, [Cordero], that their cooperation, if any, would be brought to the attention of the sentencing judge at the time that [their cases] are disposed of." Campbell then appeared in court and testified in the presence of the jury regarding the events of April 1 and 2, 2008. During direct examination, she stated that she was charged with hindering prosecution on the basis of her involvement with the defendant in the present case. The following exchange then occurred:

"[The Prosecutor]: Now, after you talked to your attorney, did you make any decisions about being more forthcoming with the police and with the state's attorney's office; did you end up coming in and giving more information?

"[The Witness]: Yes.

"[The Prosecutor]: Okay. Now, when you and I spoke it was inspector Joe Forte [who] was there and your attorney. Is that correct?

"[The Witness]: Yes.

"[The Prosecutor]: And what promises, if any, were made to you about your testimony here today?

"[The Witness]: None.

"[The Prosecutor]: Is what you're telling us here today the truth?

"[The Witness]: Yes."

As with Cordero, the prosecutor asked no further questions of Campbell to clarify the discrepancy between her testimony and the prosecutor's representations to the court and counsel. On cross-examination, defense counsel did not ask Campbell any questions on the subject of any agreement with the state.

Despite having been informed by the prosecutor that both Cordero and Campbell had an agreement with the state, defense counsel did not directly confront either witness with this information. The record reveals that he asked neither witness any questions pertaining to any specific agreement either had with the state other than general questions to Cordero as already noted.

During his jury argument, defense counsel identified both Cordero and Campbell as being "charged in this case," and he urged jurors to carefully consider their testimony in light of an accomplice instruction that they would receive from the court. While the prosecutor argued that these witnesses were credible, no reference was made to whether either or both had any agreement regarding their impending sentencings. In its final charge to the jury, the court identified Cordero and Campbell as having provided accomplice testimony and instructed the jury accordingly.[13]

---

[13] The court provided the jury with the following instructions: "In weighing the testimony of Herman Cordero and Jennifer Campbell, you should consider the fact that they are facing charges as accomplices to the crimes charged in this case. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character. In weighing the testimony of an accomplice who has not yet been sentenced or who has case—or whose case has not yet been disposed of or who has not been charged with offenses in which the state has evidence, you should keep in mind that he or she may, in his or her own mind, be looking for some favorable treatment in the sentence of disposition of his

The state contends that because the agreements with Cordero and Campbell were disclosed by the prosecutor to both the court and the defendant, the defendant's decision not to use that information during cross-examination constitutes a waiver of the present claim. We disagree.

The state cites *Evans* v. *United States*, 408 F.2d 369, 370 (7th Cir. 1969), for the proposition that the time to use information regarding witness agreements is during trial or not at all. While *Evans* has not been explicitly overruled, the United States Court of Appeals for the Second Circuit, in its consideration of this issue in *Jenkins* v. *Artuz*, 294 F.3d 284 (2d Cir. 2002), reached a different conclusion. Although the factual underpinnings of *Evans* and *Jenkins* differ, the court's salutary language in *Jenkins* is pertinent to the case at hand. In *Jenkins*, at the trial's outset, the prosecutor told the court that the state had entered into a plea agreement with one of its witnesses, as a condition of which the witness had agreed to cooperate and testify truthfully and fully. Id., 287. The prosecutor further stated that she expected the witness to acknowledge the agreement during direct examination. Id. In the course of direct examination, however, the prosecutor asked the witness no questions about his plea agreement with the state as she previously had suggested she would. Id., 288. Thereafter, on cross-examination, despite multiple inquires from defense counsel, the witness denied the existence of any agreement.[14] Id., 288–89. On redirect

---

or her own case or hoping not to be arrested. Therefore, he or she may have such an interest in the outcome of this case that his or her testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it."

[14] The following exchange took place during cross-examination between defense counsel and the state's witness:

"[Defense Counsel]: And before you testified, your attorney and [Solomon] Landa [the prosecutor in the first trial] worked out a deal; is that correct?

"[The Witness]: No, that is not correct.

"[Defense Counsel]: That's not correct?

examination, the prosecutor did not seek to correct her witness' testimony denying the existence of a plea agreement.[15] Id., 289. Later, in her argument to the jury, the prosecutor also attempted to bolster the witness' credibility by falsely suggesting the absence of an agreement between the witness and the state despite her knowledge to the contrary. Id., 294. On appeal, the *Jenkins* court reasoned that when a witness testifies falsely about the existence of a sentencing arrangement known by defense counsel and the prosecutor fails to correct the false testimony of his witness, defense counsel's failed attempt to draw out the presence of such an agreement belies any suggestion that counsel's failure to adequately probe can be characterized as trial strategy or waiver. Id., 295–96. Thus, the *Jenkins* court concluded that although defense counsel did not explicitly raise the issue of the plea agreement at trial, his claim was not waived in light of the defendant's affirmative attempt to clarify the issue. Id., 296. The conduct

---

"[The Witness]: No.

"[Defense Counsel]: Did you and your attorney work out a deal that for these two Class B felonies you were going to take a plea; is that right?

"[The Witness]: No.

"[Defense Counsel]: That's not true?

"[The Witness]: No, it's not. . . .

"[Defense Counsel]: Before you testified in the proceedings on May 11, 1993, you were promised and got an offer from the Assistant District Attorney [Solomon] Landa that if you pled guilty to those charges you would get six months in jail and probation?" (Internal quotation marks omitted.)

Before the witness could answer, the prosecutor objected that the question had been "[a]sked and answered." (Internal quotation marks omitted.) The court overruled the objection, and defense counsel continued with his questioning; however, the witness persisted in denying the existence of any agreement. *Jenkins* v. *Artuz*, supra, 294 F.3d 288–89.

[15] Not only did the prosecutor not attempt to correct the witness' misleading testimony, but she instead attempted to reinforce the impression that no agreement existed:

"[The Prosecutor]: [Sir], have I ever met with you before today?

"[The Witness]: No.

"[The Procecutor]: Did you make any deals with me?

"[The Witness]: No." *Jenkins* v. *Artuz*, supra, 294 F.3d 289.

of defense counsel in the present case is analogous on this particular point. After the prosecution elicited testimony from Cordero regarding the plea agreement that was at best misleading, and at worst false, defense counsel attempted twice to draw out the presence of the plea agreement from Cordero. In response, however, Cordero denied anticipating any benefit from his testimony. On the basis of this record, we do not believe that the defendant's failure to elicit accurate and complete testimony from Cordero constituted a waiver.

We next turn to the defendant's principal claim that the prosecutor's failure to correct false testimony, coupled with his comments at closing argument about the credibility of Campbell and Cordero, prejudiced his trial, violating his right to due process.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), whether the entire trial was so infected with unfairness so as to deprive the defendant of his due process right to a fair trial. See *State* v. *Schiavo*, 93 Conn. App. 290, 302, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006). These factors include the extent to which the impropriety was invited by defense conduct, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case. *State* v. *Williams*, supra, 540.

As noted, the first step in our analysis is to determine whether the prosecutor's conduct properly can be characterized as improper. Here, the conduct in question is the prosecutor's failure to correct allegedly false testimony regarding plea agreements even though both the court and defense counsel had been properly informed of the contours of the arrangement.[16] "It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within [the] definition of evidence [in *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] favorable to an accused. . . . A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000). The United States Supreme Court established a framework for the application of *Brady* to witness plea agreements in *Giglio* v. *United States*, 405 U.S. 150, 153–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Drawing from those cases, our Supreme Court has stated: "[D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* v. *Illinois*, 360 U.S. 264, 266–69, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have

---

[16] It is important, and fair, to note that there is no claim, as there was in *Jenkins*, that the prosecutor aggravated the impact of the witnesses' misleading statements by arguing to the jury that neither Cordero nor Campbell had any arrangement with the state and therefore no incentive to testify favorably for the state.

affected the judgment of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 560–61, 710 A.2d 1348 (1998). The prerequisite of any claim under the *Brady*, *Napue* and *Giglio* line of cases, however, is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. See *State* v. *Floyd*, supra, 737 ("[w]e first consider whether there was an undisclosed, implied plea agreement between [the witness] and the state").

As previously noted, the prosecutor in this case informed both defense counsel and the court of the agreement that the state had with each witness. While the contours of the agreement did not include a specific sentencing outcome, the fact that the prosecutor had agreed to bring the cooperation of the witnesses to the court's attention at their sentencings was sufficient inducement for their cooperation with the state to require its disclosure. Therefore, the prosecutor had a duty to correct their testimony denying the existence of any agreements with the state. "[T]he [g]overnment can discharge its responsibility under *Napue* and *Giglio* to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible." (Internal quotation marks omitted.) *Beltran* v. *Cockrell*, 294 F.3d 730, 736 (5th Cir. 2002); see also *United States* v. *Decker*, 543 F.2d 1102, 1105 (5th Cir. 1976), cert. denied sub nom. *Vice* v. *United States*, 431 U.S. 906, 97 S. Ct. 1700, 52 L. Ed. 2d 390 (1977). Here, as noted, the prosecutor discharged this responsibility at the outset of the witnesses' testimony by outlining for the court and defense counsel the parameters of the witnesses' understandings with the prosecution. Given the witnesses' subsequent misleading testimony, however, this advance notice to the court and counsel outside the presence

of the jury was inadequate, as the jurors could well have been left with the impression, created by Cordero's and Campbell's testimony, that neither had any incentive to testify favorably for the state. Under these circumstances, we conclude that the prosecutor had a duty to correct the record before the jury.

Our analysis of this claim does not end, however, with our conclusion that the prosecutor should have sought to correct the witnesses' misleading testimony. Having concluded that the prosecutor should have taken further steps to correct the record, we now determine whether the defendant was denied a fair trial as a result of the prosecutor's failure to act. This inquiry requires us to assess the *Williams* factors.

On the basis of our careful review of the record, we conclude that although the prosecutor had a duty to correct the misleading testimony of Cordero and Campbell, this failure to act did not deprive the defendant of his due process right to a fair trial. While both Cordero's and Campbell's substantive testimony were a part of the state's case, additional trial testimony as well as physical evidence pointed to the defendant's involvement as the Watertown assailant.[17] Furthermore, and unlike the circumstances of *Jenkins* v. *Artuz*, supra, 294 F.3d 284, the record reveals that the prosecutor did not attempt to use this testimony to the state's advantage by bolstering it or specifically referring to it in jury argument or in any other manner.[18] Although

[17] Indeed, it can be fairly concluded from the record that while Campbell's testimony was clearly inculpatory, Cordero's testimony was equivocal and, in some instances, favorable to the defendant.

[18] In support of his contention that the prosecutor's failure to correct the witnesses' testimony violated his right to a fair trial, the defendant does not discuss the *Williams* factors but instead cites to various federal appellate court cases where a due process violation was found despite disclosure of the plea agreement. A review of those cases and the relevant decisional law, however, reveals that when courts have found a constitutional violation despite the disclosure of a plea agreement, an aggravating factor has been present. See *Jenkins* v. *Artuz*, supra, 294 F.3d 287–89 (government witness falsely denied entering into plea agreement with government during his

the state commented, generally, about the credibility of both witnesses during its closing argument, the state did not suggest, at any point that either witness should be believed on the ground that they had testified without the benefit of any agreement with the state regarding their own pending cases. And, the jury was made aware of both Cordero's and Campbell's status as charged accomplices through their direct testimony at the behest of the state. Additionally, the court instructed the jury to carefully scrutinize their testimony on the basis of this status. See footnote 13 of this opinion. Accordingly, we conclude, that the prosecutor's lapse in judgment in not correcting the witnesses' errant testimony did not deprive the defendant of a fair trial.

V

The defendant's final claim is that the state did not comply with General Statutes § 54-64e (b) (4),[19] which provides that the defendant shall receive notice at the time of release that any crime committed while on

---

testimony and prosecutor reinforced this false testimony on redirect and in her closing argument); *DeMarco* v. *United States*, 928 F.2d 1074, 1075 (11th Cir. 1991) (government witness falsely testified he had not made deal with government, and "[i]n her jury argument the prosecutor adopted and emphasized [witness'] perjured testimony"); *Mills* v. *Scully*, 826 F.2d 1192, 1196 (2d Cir. 1987) (no misconduct where "[t]he prosecutor made no effort to exploit the inaccurate trial testimony, either through the testimony of other witnesses or through argument in summation" [citation omitted]); *United States* v. *Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) ("The purpose of disclosing the terms of a plea bargain is to furnish defense counsel with information which will allow him to attack the credibility of the witness. The defendant gains nothing, however, by knowing that the Government's witness has a personal interest in testifying unless he is able to impart that knowledge to the jury."). In the present case, the prosecutor did not seek to exploit the witnesses' misleading statements in any way.

[19] General Statutes § 54-64e (b) provides in relevant part: "When any person is released pursuant to the provisions of sections 54-63a to 54-63g, inclusive, or sections 54-64a to 54-64c, inclusive, such person shall be notified in writing at the time of release . . . (4) that any crime committed while on release may subject him to enhanced penalties pursuant to section 53a-40b."

release may subject him to the enhanced penalties of § 53a-40b.[20] We disagree.

The defendant essentially concedes that, by their express terms, § 53a-40b does not condition its application on compliance with § 54-64e, nor does § 54-64e provide that the failure to comply with that section deprives the trial court of discretion to impose a sentence enhancement under § 53a-40b. However, the question of whether compliance with the notice provision of § 54-64e is a legal predicate to the application of § 53a-40b is an issue that our courts have not directly considered. See *State* v. *Fagan*, 280 Conn. 69, 89 n.14, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

We need not reach that question in the present case, however, because the evidence was sufficient to support the court's finding that the defendant had received such notice. The court noted that the defendant's name, Victor Jordan, and signature, appeared at the bottom of the appearance bond under the statement, "I have read/have had read to me the notices on page 2 of this form and I understand the notices." On page two of that form is the very notice that is in question in § 54-64e (b) (4). Therefore, the trial court did not abuse its discretion in sentencing the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[20] General Statutes § 53a-40b provides: "A person convicted of an offense committed while released pursuant to sections 54-63a to 54-63g, inclusive, or sections 54-64a to 54-64c, inclusive, other than a violation of section 53a-222 or 53a-222a, may be sentenced, in addition to the sentence prescribed for the offense to (1) a term of imprisonment of not more than ten years if the offense is a felony, or (2) a term of imprisonment of not more than one year if the offense is a misdemeanor."