******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* VICTOR L. JORDAN, SR.
(SC 18995)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued January 13—officially released November 4, 2014*

*Pamela S. Nagy*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The two issues that we must resolve in this certified appeal are whether the Appellate Court properly concluded that the defendant, Victor L. Jordan, Sr., was not deprived of his right to a fair trial due to the prosecutor's failure to correct the potentially misleading testimony of two witnesses, and whether this court should overrule its construction of the evidence tampering statute, General Statutes § 53a-155,[1] in *State* v. *Foreshaw*, 214 Conn. 540, 572 A.2d 1006 (1990), and hold that the defendant's conduct in the present case did not constitute evidence tampering under § 53a-155.[2] The defendant appeals from the judgment of the Appellate Court affirming his conviction, rendered after a jury trial, of attempt to commit robbery in the third degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-136, conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 and 53a-136, and tampering with physical evidence in violation of § 53a-155. The defendant makes two primary claims on appeal. First, the defendant claims that the Appellate Court improperly concluded that the prosecutor's failure to correct the potentially misleading testimony of two witnesses denying they were promised benefits by the state in exchange for their testimony did not violate the defendant's due process right to a fair trial. Second, the defendant claims that this court should overrule its interpretation of § 53a-155 in *Foreshaw* and hold that, under a proper understanding of that statute, his conviction cannot stand. We reject the defendant's claim regarding the prosecutor's failure to correct the potentially misleading testimony of two witnesses, and we also reject his claim that *Foreshaw* should be overruled. We conclude, however, that under a proper understanding of *Foreshaw*, the defendant's conduct did not come within the ambit of § 53a-155. Accordingly, we affirm in part, and reverse in part, the judgment of the Appellate Court, and conclude that the defendant's conviction under § 53a-155 should be set aside.

The relevant facts and procedural history giving rise to this appeal are set forth in the opinion of the Appellate Court. "The jury reasonably could have found the following facts. On April 1, 2008, Tannith McDonnell, the assistant manager of the Naugatuck Savings Bank [bank] located at 565 Straits Turnpike in Watertown, met an acquaintance, Patsy Lombardi, in the bank parking lot at approximately 4 p.m. after she had locked the bank's doors for the day. While seated in Lombardi's car, [McDonnell] observed a man approach the bank who was wearing a heavy black coat with a raised hood, a camouflage ski mask, dark jeans and black gloves. The man placed a gloved hand inside his pocket and pulled 'aggressively' on the bank door with the other hand. When the locked door would not open, the man

walked back down the sidewalk and out of sight. McDonnell waited until the man cleared the corner and then used Lombardi's cell phone to call 911 and report her observations to the police. Watertown [P]olice Officer Jeffrey McKirryher, who was on duty nearby directing traffic, received McDonnell's report over his police radio. McKirryher immediately saw a likely suspect and when he called out to him, the man took off, running.

"McKirryher chased the suspect onto Birch Meadow Drive, a nearby cul-de-sac, where he saw a tan vehicle with two distinctive black doors parked at the end of the road. The suspect made brief contact with the operator of the tan vehicle and then ran into a wooded area. As the car was driven away, McKirryher broadcast his observations over his police radio. Shortly thereafter, Watertown [P]olice Detective David Bromley heard the report, saw the tan car and pursued it until it came to a halt at a police roadblock.

"Virginia Palmer was on Birch Meadow Drive walking her dog when she saw a light-skinned black or Hispanic man in a dark jacket running up her street while being chased by police. Palmer observed that the fleeing man was wearing a telephone earpiece, and she heard him say, '[M]eet me on the other street, meet me on the other street.' The man then ran into the wooded area at the top of the street. Gerald Boudreau was home on Birch Meadow Drive that afternoon and saw a black man wearing dark clothes and sunglasses run across his backyard while removing his jacket and running toward Sprucewood Road.

"Katherine Desantis, who lived on Sprucewood Road, which runs parallel to Birch Meadow Drive, saw a black man wearing a dark jacket, dark jeans and a dark colored 'do-rag' on his head, run from behind a neighbor's house. She noted that the man kept looking behind him as if he was being pursued. While the man was in the middle of the street, she saw the man remove his jacket, revealing its bright colored lining. Desantis telephoned the police as the man was in her neighbor's yard, looking around. Desantis next saw the man in her own backyard removing his gray sweatshirt and then going around to the back of her carport. Desantis' husband, Dennis Desantis, arrived home shortly after the police had left and located a sweatshirt 'crumbled up in a ball' at the far side of the carport. Two days later, Katherine Desantis located a dark jacket with a bright red-orange lining in a neighbor's trash can. The police collected the gray sweatshirt and the dark jacket from the Desantises. When removing the jacket from the trash can, the police also discovered a 'black fabric type item'; a 'neoprene-like fabric mask' that was black on one side and camouflaged on the other; a pair of black leather gloves; and a 'small, black plastic . . . shopping bag.'

"The tan automobile with two black doors that was halted by the police at the roadblock was an Infiniti

sedan registered to the defendant. The lone occupant and operator of the vehicle was Herman Cordero. Cordero testified that he fixed cars for a living and that he had been working on the defendant's car at a nearby Super 8 Motel on the day of the incident. He stated that, because he needed more tools, he decided to get some from his house. Cordero testified that he drove the defendant's Infiniti, with the defendant as a passenger, to retrieve the tools and that on the way the defendant asked him to pull over in the LaBonne's Supermarket parking lot. LaBonne's Supermarket and [the bank] are on opposite ends of the same parking lot. The defendant gave no reason for wanting to alight from the car, but simply stated that he would be back in a few minutes. Cordero claimed that because it took the defendant longer to return than he had expected, he decided to continue to his home to retrieve the tools and then return to the parking lot for the defendant. Once en route, however, he changed his mind about driving alone to his home because he did not want the defendant to think he was stealing his car. Accordingly, he claimed, he pulled into a cul-de-sac for a few minutes to wait. He stated that it was just a coincidence that he stopped in the cul-de-sac that the fleeing suspect had used as an escape route. Although the police discovered three cell phones in the Infiniti pursuant to a search warrant, Cordero denied making any contact with the [defendant] between the time he dropped him off at the parking lot and his confrontation with the police.

"One of the cell phones discovered by the police led them to Jennifer Campbell, a woman who was romantically involved with the defendant. Campbell testified that the defendant called her at about 8 p.m. on April 1, 2008, and said that he needed help. He asked her to meet him at the Super 8 Motel where, he said, he was going by taxicab and where he would be with his wife and children. Campbell testified that when she arrived at the motel, the defendant asked her to rent a room in her name, and he provided her with money for the cost of the room. According to Campbell, after settling into the room with her, the defendant attempted multiple times to call a person named 'Jun,' but he could not reach him. Although she knew who Jun was, she did not learn that his real name was Herman Cordero until after she was arrested. Campbell testified that she had seen the defendant and Cordero, whom she knew as Jun, together '[v]ery many' times, and she described the two men as '[v]ery tight . . . very close.'

"While the defendant and Campbell were in the motel room, the defendant expressed concern that 'they're' going to connect him and her together because his iPhone, left in the car, contained her first and last name in its directory. Campbell stated that when she asked the defendant who 'they' were, the defendant avoided answering the question. After some further discussion, Campbell called Eric Pearson to ask that he rent a

separate room for the defendant. Thereafter, Campbell drove to her home in Bristol to retrieve clothing for the defendant because his jeans were muddy and he was wet and cold. Campbell testified that when she returned with the clothing and asked the defendant why he was wet, he replied that he was going to 'commit a heist' in Watertown but the building was closed, and that the police had chased him through a muddy wooded area, believing that he was the person who had been spotted wearing a mask in the vicinity of the bank.

"Campbell also testified that on April 2, 2008, the defendant asked her for a ride to the court in Bridgeport. Campbell agreed and drove to Waterbury in her burgundy Buick LeSabre where she picked up the defendant at a [7-Eleven] store. She drove the defendant to the Super 8 Motel, where, she claimed, he got 'very excited' and told her to '[k]eep going, get out of there, we got to get out of here.' She testified that she believed the defendant was excited as a result of seeing Detectives David McKnight and Michael Ponzillo of the Waterbury [P]olice [D]epartment speaking with the defendant's wife at the Super 8 Motel. In his testimony, McKnight stated that he saw a red Buick in the parking lot, recognized the defendant as its front seat passenger and locked eyes with him. McKnight testified that after he saw the defendant motion the Buick's operator to keep moving, the car took off at a high rate of speed.

"Later in the day, after Campbell received cell phone messages that Waterbury detectives wanted to speak with her, the defendant drove her to the police station. According to Campbell, although she initially was uncooperative, she eventually agreed to help the police try to lure the defendant to a place where he could be apprehended. That effort, however, proved unsuccessful.

"On April 16, 2008, the police tracked the defendant to a residence on Congress Avenue in Watertown, where he was found hiding in a closet. The defendant refused to comply with the commands of the police to submit to arrest. Instead, he was removed from the residence by force and taken into custody.

"The items of clothing and apparel seized by the police from the Desantises' neighbor's trash can were submitted to the state forensic laboratory for DNA analysis with the result that the defendant was included as a contributor in each sample except one. The lone exception was the mixture extracted from the collar of the jacket. As to this sample, the police concluded only that the defendant could not be eliminated as a contributor.

"Following the police investigation, the defendant was charged by information with the following offenses: count one, attempt to commit robbery in the first degree in violation of [General Statutes] §§ 53a-49 (a) (2) and

53a-134 (a) (4); count two, conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134; count three, attempt to commit larceny in the second degree in violation of [General Statutes] §§ 53a-49 (a) (2) and 53a-123 (a) (3); count four, conspiracy to commit larceny in the second degree in violation of §§ 53a-48 and 53a-123 (a) (3); and count five, tampering with physical evidence in violation of § 53a-155.

"At the conclusion of its case-in-chief in the defendant's jury trial, the state conceded that the evidence was insufficient to find the defendant guilty of attempt to commit [robbery in the first degree] and conspiracy to commit robbery in the first degree. The parties agreed, however, that sufficient evidence existed to find the defendant guilty of the lesser offenses of attempt to commit [robbery in the third degree] and conspiracy to commit robbery in the third degree. Accordingly, the trial court rendered judgment of acquittal on the charged offenses relating to robbery in the first degree and expressed its intention to submit the lesser inchoate offenses to the jury. The court also rendered judgment of acquittal on the counts charging the defendant with attempt to commit [larceny in the second degree] and conspiracy to commit larceny in the second degree.

"Thereafter, the state filed an amended information that conformed to the court's rulings, and the jury found the defendant guilty as charged in the amended information. As noted, the defendant also had been charged in a part B information with committing each of the charged offenses while on pretrial release in violation of [General Statutes] § 53a-40b and with being a persistent serious felony offender in violation of General Statutes § 53a-40 (c). The defendant elected that the part B charges be tried to the court. Following an evidentiary hearing, the court found the defendant guilty as charged in part B of the amended information. The court thereafter imposed a total effective sentence of thirty years imprisonment, to be served consecutively to any sentence the defendant was then serving." (Footnotes omitted.) *State* v. *Jordan*, 135 Conn. App. 635, 638–44, 42 A.3d 457 (2012). Additional facts will be set forth as necessary.

The defendant appealed from the trial court's judgment to the Appellate Court, claiming, inter alia,[3] that he was denied a fair trial because the prosecutor failed to correct the allegedly false testimony of Cordero and Campbell; id., 658; and that his conviction of tampering with physical evidence under § 53a-155 should be reversed because his conduct did not fall within the terms of the statute. Id., 652. In response to the prosecutorial impropriety claim, the state argued that the defendant was not entitled to a new trial because (1) the defendant had waived his due process claim by not confronting the witnesses at trial, (2) the prosecutor had not acted improperly, and (3) in the alternative, the

defendant was not harmed by the prosecutor's failure to correct the witnesses' testimony. Id., 658. The Appellate Court agreed with the defendant that he had not waived his claim and that the prosecutor had a duty to correct the testimony, but ultimately concluded that this impropriety had not denied the defendant his due process right to a fair trial.[4] Id., 667. With respect to the defendant's claim that, under a proper interpretation of § 53a-155, his conduct did not violate that statute, the Appellate Court determined that this claim would require it to overrule this court's decision in *Foreshaw*, which was a "task beyond [the Appellate Court's] charter." Id., 653. This certified appeal followed.

I

We first consider the defendant's claim that the Appellate Court improperly concluded that the prosecutor's failure to correct the potentially misleading[5] testimony of Cordero and Campbell did not deprive the defendant of a fair trial. The defendant argues that the prosecutor's alleged impropriety violated his right to a fair trial because there is a reasonable likelihood that the potentially misleading testimony of these witnesses could have affected the jury's verdict as their testimony was crucial to the state's case. The state responds that the prosecutor's failure to correct the potentially misleading testimony did not violate the defendant's due process right to a fair trial because there was sufficient independent evidence of the defendant's guilt.[6] We agree with the state.

"The following additional facts are relevant to this claim. Before Cordero testified and outside the presence of the jury, the prosecutor explained to defense counsel and to the court on the record that he had spoken to Cordero's counsel and that Cordero, who had been charged in connection with the present case, indicated that he may elect to testify for the state. The prosecutor further stated: '[J]ust so the record is clear, what I said to [Cordero's counsel] and what I said to [defense counsel] about [Cordero's] cooperation is that if he testified we would bring his cooperation to the sentencing judge . . . when his case is disposed of. And that's the extent of the agreement.'

"Thereafter, Cordero appeared in court and testified in the presence of the jury. He admitted that he was currently incarcerated and charged with bank robbery for two separate incidents. Following testimony regarding the events of April 1, 2008, the prosecutor asked: 'And what—what were you promised in exchange for testifying here today?' to which Cordero responded, '[n]othing.' The prosecutor thereafter asked no further questions to clarify the discrepancy between Cordero's answer and representations the prosecutor had made to the court and counsel before Cordero's testimony. On cross-examination, the following exchange took place between defense counsel and Cordero:

" '[Defense Counsel]: And you indicate you don't expect any kind of benefit from testifying here today?

" '[Cordero]: No, sir.

" '[Defense Counsel]: Okay. You—you don't expect to get any kind of consideration for your two robbery cases for testifying here today?

" '[Cordero]: No, sir.

" '[Defense Counsel]: And you've been incarcerated since the date of your arrest. Correct?

" '[Cordero]: Yes, sir.

"After Cordero had concluded his testimony, and left the witness stand, the prosecutor informed the court that the state's next witness, Campbell, was represented by counsel, and that [the prosecutor] needed to speak with her counsel. Thereafter, the prosecutor placed the following information on the record, outside the presence of the jury, but in the defendant's and defense counsel's presence: 'The next witness is . . . . Campbell. And again, as [defense counsel] is aware, she has a pending case. I believe she's charged with hindering prosecution based on [the events relating to the case on trial]. [Campbell] is represented by [counsel], and [I] made the same representation to her and her client as I did to [Cordero's counsel] and his client . . . that their cooperation, if any, would be brought to the attention of the sentencing judge at the time that [their cases] are disposed of.' Campbell then appeared in court and testified in the presence of the jury regarding the events of April 1 and 2, 2008. During direct examination, she stated that she was charged with hindering prosecution on the basis of her involvement with the defendant in the present case. The following exchange then occurred:

" '[The Prosecutor]: Now, after you talked to your attorney, did you make any decisions about being more forthcoming with the police and with the [S]tate's [A]ttorney's [O]ffice; did you end up coming in and giving more information?

" '[Campbell]: Yes.

" '[The Prosecutor]: Okay. Now, when you and I spoke, it was [I]nspector Joe Forte [who] was there and your attorney. Is that correct?

" '[Campbell]: Yes.

" '[The Prosecutor]: And what promises, if any, were made to you about your testimony here today?

" '[Campbell]: None.

" '[The Prosecutor]: Is what you're telling us here today the truth?

" '[Campbell]: Yes.'

"As with Cordero, the prosecutor asked no further questions of Campbell to clarify the discrepancy between her testimony and the prosecutor's representations to the court and counsel. On cross-examination, defense counsel did not ask Campbell any questions on the subject of any agreement with the state.

"Despite having been informed by the prosecutor that both Cordero and Campbell had an agreement with the state, defense counsel did not directly confront either witness with this information. The record reveals that he asked neither witness any questions pertaining to any specific agreement either had with the state other than general questions to Cordero as already noted.

"During his jury argument, defense counsel identified both Cordero and Campbell as being 'charged in this case,' and he urged jurors to carefully consider their testimony in light of an accomplice instruction that they would receive from the court. While the prosecutor argued that these witnesses were credible, no reference was made to whether either or both had any agreement regarding their impending sentencings. In its final charge to the jury, the court identified Cordero and Campbell as having provided accomplice testimony and instructed the jury accordingly." Id., 658–61.

The first certified question requires us to determine whether the defendant was harmed by the prosecutor's failure to correct the potentially misleading testimony of Cordero and Campbell.[7] "The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in *Brady* v. *Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and we begin our consideration of the [defendant's] claim with a brief review of those principles. In *Brady*, the court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [prosecutor]. . . . The United States Supreme Court also has recognized that [t]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . Because a plea agreement is likely to bear on the motivation of a witness who has agreed to testify for the state, such agreements are potential impeachment evidence that the state must disclose. . . .

"[A] prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. . . . In a classic *Brady* case . . . the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. . . .

"When, however, a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt. . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . *unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury.* . . .

"In accordance with these principles, our determination of whether [the witness'] false testimony was material under *Brady* and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which [the defendant was] otherwise able to impeach [the witness]." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–73, 71 A.3d 512 (2013).

Applying the foregoing principles to the present case, we conclude that the prosecutor's failure to correct the potentially misleading testimony of two witnesses did not violate the defendant's due process right to a fair trial because, weighing the probable effect of that testimony against the defendant's impeachment of those witnesses and the strength of the state's case, there is no reasonable likelihood that the potentially misleading testimony could have affected the judgment of the jury. Examining first the strength of the state's case, there was overwhelming evidence of the defendant's guilt even without the testimony of Cordero and Campbell. See, e.g., id., 388. Specifically, the state presented the

following evidence to the jury independent of Cordero and Campbell's testimony. A male (perpetrator) dressed in a heavy black coat with a raised hood, camouflage ski mask, dark jeans, and black gloves attempted to open the locked door of the bank. *State* v. *Jordan*, supra, 135 Conn. App. 638. A police officer then chased the perpetrator from the bank to a nearby automobile, which was registered to the defendant, where the perpetrator spoke with Cordero, the operator of the automobile. Id., 639. The automobile contained three cell phones, at least one of which belonged to the defendant. Id., 641. After speaking with Cordero, the perpetrator ran down a nearby street, where three witnesses saw him and later identified him as a black or Hispanic male wearing dark clothing. Id., 639. One witness saw the perpetrator remove a jacket with brightly colored lining and a gray sweatshirt, both of which were subsequently recovered alongside other clothing items. Id., 639–40. State forensic laboratory DNA analysis revealed that the defendant "was included as a contributor in each [clothing] sample except one . . . [in which] the defendant could not be eliminated as a contributor." Id., 643. While removing this clothing, the perpetrator ran through the woods, where it was raining and muddy. The police later found muddy, wet clothes in a motel room occupied by the defendant's family. When confronted by the police, the defendant attempted to escape by driving away from the motel and by hiding in a closet before his eventual arrest.

In sum, the state's case did not depend on the testimony of Cordero and Campbell because the state presented overwhelming evidence independent of that testimony connecting the defendant to the crime. As a result, we disagree with the defendant that the testimony of Cordero and Campbell was "vital" to the state's case. The testimony of Cordero was, at best, only partially favorable to the state. Although Cordero testified that the defendant was at a location near the bank at the time of the crime, the rest of his testimony did not further either party's theory and, moreover, as the prosecutor asserted in his closing statement, "didn't make much sense when you put it under a microscope."[8] Campbell provided more support for the state than Cordero, but much of her testimony was corroborative of other evidence.[9] The portions of her testimony that were not corroborated by other witnesses, such as the defendant's confession to her on the night of the crime, were also unnecessary to establish the defendant's guilt beyond a reasonable doubt in light of the substantial evidence connecting the defendant to the crime.

Turning to the question of whether defense counsel was able to impeach the witnesses' testimony, we conclude that the defendant had ample opportunity, and did in fact, impeach Cordero and Campbell.[10] Both defense counsel and the prosecutor discounted much of Cordero's testimony in their closing statements, suggesting

that Cordero's testimony "doesn't make any sense" and implying that he was more involved with the crime than he had revealed. Regarding Campbell's credibility, defense counsel emphasized in his cross-examination that she had initially been uncooperative with the police and had told them that she knew nothing about the attempted robbery. She also testified that she had been arrested for hindering prosecution on April 16, 2008, and made conflicting statements about whether she told the police about the defendant's involvement before or after her arrest. In his closing statement, defense counsel reiterated that Campbell had "changed her story twice" and suggested that there might have been some "consideration" for one of her statements in particular as she had added more information on the same day that she was released from jail.

Defense counsel also challenged Campbell on a variety of other grounds. For example, he questioned her testimony that the defendant was "wet" when she spoke to him after midnight on April 1, 2008, insinuating that it would not make sense for him to still be wet if the attempted robbery occurred eight hours earlier. Defense counsel suggested that it was strange for the defendant and his family to have stayed at the same motel as Campbell if, as she testified, the defendant believed that the police would be able to find Campbell via the cell phone in his vehicle. Defense counsel also raised the fact that Campbell was an occasional drug user. In his closing argument, defense counsel emphasized that Campbell had "much to gain in this case from coming here and testifying . . . ." Finally, the trial court provided the jury with instructions on accomplice testimony, stating, in relevant part, that "[i]n weighing the testimony of . . . Cordero and . . . Campbell, you should consider the fact that they are facing charges as accomplices to the crimes charge[d] in this case."[11]

After evaluating the defendant's opportunity to impeach Cordero and Campbell within the context of the entire trial, we conclude that the state's case was so overwhelming that there was no reasonable likelihood that the potentially misleading testimony of Cordero and Campbell could have affected the judgment of the jury. Accordingly, we conclude that the Appellate Court properly determined that the prosecutor's failure to correct these witnesses' testimony did not deprive the defendant of a fair trial.

## II

We next consider the defendant's claim that this court should overrule its construction of § 53a-155 (a) in *State v. Foreshaw*, supra, 214 Conn. 540, and hold that there was insufficient evidence to support his conviction for tampering with physical evidence in violation of § 53a-155 (a). See footnote 2 of this opinion. The defendant claims that the evidence tampering statute was not meant to apply to situations in which an individual

discards evidence in an attempt to evade the police. On the basis of our review of the record, it is clear that the defendant seeks to overrule *Foreshaw* only because of his mistaken belief, shared by the Appellate Court and based on a misunderstanding of this court's holding in *Foreshaw*, that he cannot prevail on his insufficiency claim unless we overrule *Foreshaw*. See *State* v. *Jordan*, supra, 135 Conn. App. 653 ("as the defendant acknowledges in his brief, his success in this claim would require us to overrule a Supreme Court decision, a task beyond [the Appellate Court's] charter"). To the extent that this court's holding in *Foreshaw* is unclear, we take this opportunity to clarify it. We find no cogent reason or inescapable logic, however, that would compel us to overrule *Foreshaw*, and, accordingly, we decline to do so. See, e.g., *O'Connor* v. *O'Connor*, 201 Conn. 632, 639, 519 A.2d 13 (1986). Nonetheless, we agree with the defendant that, under a proper interpretation of § 53a-155 (a) and *Foreshaw*, there was insufficient evidence in the present case to support his conviction for tampering with physical evidence. Accordingly, we reverse in part the Appellate Court's judgment with respect to the defendant's conviction under § 53a-155.

We begin our analysis with the language of the statute at issue. Section 53a-155 (a) provides in relevant part that "[a] person is guilty of tampering with or fabricating physical evidence if, *believing that an official proceeding is pending, or about to be instituted*, he . . . [a]lters, destroys, conceals or removes any record, document or thing *with purpose to impair its verity or availability in such proceeding* . . . ." (Emphasis added.)[12] The state therefore must establish that the defendant (1) believed that an official proceeding was pending or about to be instituted, (2) discarded the evidence at issue, and (3) acted with the intent to prevent the use of the evidence at an official proceeding. Section 53a-155 (a) does not specify, however, whether the phrase "about to be instituted" connotes probability of occurrence or temporal proximity. It also does not establish whether the "belief" is what a reasonable person would believe, or, rather, what the *defendant* believed.

The court answered these questions, albeit implicitly, in *Foreshaw*. In that case, the defendant, Bonnie Jean Foreshaw, shot and killed the victim in front of several witnesses and fled the scene in her automobile. *State* v. *Foreshaw*, supra, 214 Conn. 542–43. When a police officer arrested her shortly thereafter, the officer found a bullet in her vehicle consistent with the gun that had been used to shoot the victim. Id., 543. When the police asked Foreshaw where the gun was, Foreshaw responded that she "had thrown [it] out of the car window." Id. Foreshaw then "retraced her route with the police in an attempt to find the gun, but eventually became confused and upset and discontinued her

search. The gun was never recovered." Id. At trial, Foreshaw testified that "[u]pon seeing [the victim] fall, [she] immediately drove away and discarded the gun en route *so that she would not be caught with it*." (Emphasis added.) Id.

On appeal, Foreshaw challenged, inter alia, the sufficiency of the evidence supporting her conviction for tampering with physical evidence in violation of § 53a-155 (a) (1). Id., 549. Specifically, Foreshaw argued that "because she discarded the gun prior to any contact with law enforcement officers or the judicial system, she could not have believed an official proceeding was 'about to be instituted.' " Id., 550. Foreshaw contended that the language of § 53a-155 (a) "connotes temporal proximity between the alleged act and the official proceeding." Id., 550–51. Additionally, Foreshaw argued that "even if the state proved that she had acted with the intent to make the gun unavailable *to the police*, such an intent would not warrant conviction under the language of § 53a-155 (a) (1)." (Emphasis in original.) Id.

The court disagreed, concluding that, on the basis of the evidence presented by the state, the jury reasonably could have concluded that Foreshaw was guilty of tampering with physical evidence beyond a reasonable doubt. The state offered evidence that, inter alia, several individuals had witnessed Foreshaw shooting the victim and that Foreshaw admitted to discarding the gun "so that she would not be caught with it." Id., 543. The court concluded that this evidence provided a sufficient basis for the jury to have inferred the belief, the discard,[13] and the intent elements of § 53a-155 (a). Id., 550–51. To the extent that the reasoning of *Foreshaw* was unclear, we take this opportunity to clarify it today.

With respect to the belief element, the jury reasonably could have concluded that Foreshaw believed an official proceeding was "about to be instituted" based on the fact that Foreshaw shot the victim in the presence of numerous witnesses and anticipated being "caught" by the police. Id., 543. Although Foreshaw had no prior contact with the police before disposing of the gun, the court reasoned that § 53a-155 (a) does not require temporal proximity, but, rather, the statute "speaks to that which is *readily apt to come into existence or to be contemplated* . . . ." (Emphasis added.) Id., 551. Put another way, § 53a-155 (a) applies, no matter what stage the police have *actually* reached in their investigation, as long as the defendant believes that it is *probable* that an official proceeding will arise. This interpretation is consistent with the commentary to the Model Penal Code, from which our physical evidence tampering statute was adapted,[14] which provides that "the word 'about' should be construed more in the sense of *probability* than temporal relation." (Emphasis added.) 2 A.L.I., Model Penal Code and Commentaries (1980) § 241.7, comment 2, p. 178. It is also consistent with our interpre-

tation of an identical phrase in General Statutes § 53a-151 (a).[15] See *State* v. *Ortiz*, 312 Conn. 551, 569, 93 A.3d 1128 (2014) ("[w]e conclude that 'about to be instituted' signifies probability"). Thus, the court determined that the jury reasonably could have concluded that Foreshaw discarded the gun believing that an official proceeding was probable because she shot the victim in view of several witnesses and testified that she "discarded the gun . . . so that she would not be caught with it." *State* v. *Foreshaw*, supra, 214 Conn. 543.

With respect to the intent element, the jury reasonably could have concluded that Foreshaw disposed of the gun with intent to prevent its use in an official proceeding based on the same facts. The court noted that the police play a "crucial role" in official proceedings. Id., 551. This crucial role often involves gathering evidence, explaining that evidence to a jury, and testifying against the defendant. The court in *Foreshaw* reasoned that acting with the intent to keep evidence from the police, who play a crucial role in official proceedings, may support an inference that a defendant intends to prevent the availability of that evidence at an official proceeding when the defendant believes such a proceeding is probable. See id. Thus, the court determined that the jury reasonably could have concluded that Foreshaw, who admittedly discarded the gun so that she would not be "caught with it" when police apprehended her; id., 550; intended to prevent the use of the gun at the official proceeding that she believed was about to be instituted and, therefore, was guilty beyond a reasonable doubt of tampering with physical evidence. Id., 551.

In other words, because Foreshaw anticipated that the police would apprehend her on the basis of information connecting her to the shooting, she disposed of the gun believing that an official proceeding, and not just an investigation, was pending or probable. The jury thus reasonably could have inferred that Foreshaw discarded the evidence to prevent its use against her in an official proceeding that she believed was probable. Conversely, had Foreshaw discarded the gun to prevent detection or to avoid being implicated in the shooting in the first instance, and thus believing that only an investigation, and not an official proceeding, was pending or probable, the belief and intent elements under § 53a-155 would be lacking.

The defendant contends that *Foreshaw* was wrongly decided because § 53a-155 does not contain the word "investigation," whereas the Model Penal Code physical evidence tampering provision from which it was adapted contains both "official proceeding" and "investigation."[16] See Model Penal Code and Commentaries, supra, § 241.7, p. 175. We agree with the defendant that the legislature restricted the scope of the tampering with physical evidence statute by omitting the word "investigation." We disagree with the defendant, how-

ever, that *Foreshaw* improperly extends liability under the evidence tampering statute to conduct that the legislature deliberately excluded from the scope of § 53a-155.[17]

First, the omission of the word "investigation" from § 53a-155 does not exclude all physical evidence discarded during the course of a police investigation because the application of the statute is not dependent on the point in time in which the defendant's conduct occurs. Instead, the plain language of § 53a-155 indicates that it applies when the *defendant believes* that an official proceeding probably will occur. See Model Penal Code and Commentaries, supra, § 241.7, comment 2, p. 178 ("[t]he prosecution must establish that *the actor* believed that an official proceeding or investigation was pending or about to be instituted but *need not prove that such was in fact the case*" [emphasis added]). A defendant certainly could believe that an official proceeding probably would occur while an investigation is pending. For instance, if the defendant is aware that the police have assembled a significant amount of evidence against him during an investigation, then it is logical that the defendant would also believe that an official proceeding against him is probable.

In fact, § 53a-155 must include at least some attempts to discard evidence that occur during a police investigation, because otherwise the phrase "about to be instituted" in the statute would have no meaning. For instance, if we were to determine that § 53a-155 excluded situations in which a defendant discarded evidence while a police investigation was underway, the statute would apply only when an official proceeding was "pending" and never when it was "about to be instituted . . . ." Thus, although we emphasize that § 53a-155 does not include *all* acts to dispose of evidence that occur during a police investigation, the statute does include at least *some* of these acts.

Instead, the omission of the term "investigation" from § 53a-155 excludes situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to take place. For instance, in a scenario in which an individual commits a crime with no witnesses, and he immediately thereafter discards the one piece of physical evidence connecting him to the crime, the individual certainly could believe that the police would investigate the crime, but he would have no reason to believe that an official proceeding would likely occur because there would be no evidence or witnesses upon which the police could rely to locate and arrest him. In contrast, when an individual knows that there is significant evidence connecting him to the crime, a jury reasonably could infer that the individual believed that the investigation probably would progress into an official proceeding.[18] We emphasize, however, that it is not the existence of an investigation that is key

but, rather, whether the defendant believes an official proceeding is pending or probable.

This analysis ensures that the focus of the inquiry is on the culpability of the actor, rather than on "external factors wholly unrelated to [the actor's] purpose of subverting the administration of justice." Model Penal Code and Commentaries, supra, § 241.7, comment 2, p. 178. The Model Penal Code commentary aptly explains why culpability under the physical evidence tampering statute should not be dependent on the actual stage of police involvement: "Prior laws against tampering with evidence often required that an official proceeding or investigation actually be pending or in fact be under consideration by the public authorities. Formulations of this sort sometimes made liability of the actor turn on external factors wholly unrelated to his purpose of subverting the administration of justice. The Model [Penal] Code provision, on the other hand, focuses directly on the culpability of the individual actor." (Footnote omitted.) Id.[19]

In summary, this court's decision in *Foreshaw* is consistent with these principles because it held that a defendant may be found guilty of tampering with evidence during the course of a police investigation only when the defendant has destroyed or concealed evidence of a crime *and the circumstances would support a finding that the defendant believed that an official proceeding, as defined in General Statutes § 53a-146 (1), was about to be instituted and intended to impair the availability of the evidence at that proceeding.* See *State v. Foreshaw*, supra, 214 Conn. 551. Contrary to the defendant's contention in the present case, this court did not conclude in *Foreshaw* that a defendant may be found guilty of tampering with evidence when the defendant has destroyed or concealed evidence during an investigation in order to avoid detection.

In light of the foregoing, we decline to overrule this court's prior construction of § 53a-155 in *Foreshaw*. Accordingly, we apply the holding in *Foreshaw* to the present case. See footnote 2 of this opinion. The defendant claims that his conviction must be reversed because there was no evidence that his intent at the time he discarded the clothing and mask was to prevent its use against him at a criminal trial that he believed probable. The defendant contends that the only reasonable view of the evidence is that he discarded his clothing and mask while being closely pursued by a police officer in order to prevent its use in an investigation so that he could escape detection and avoid arrest. We agree with the defendant, and, therefore, we conclude that the Appellate Court improperly determined that the evidence was sufficient to support the conviction of tampering with physical evidence.

When evaluating whether there is sufficient evidence to support a conviction, "[i]t is our function to review

the evidence and *construe it as favorably as possible with a view toward sustaining the conviction*, and then [to] determine whether, in light of the evidence, the trier of fact could reasonably have reached the conclusion it did reach." (Emphasis added; internal quotation marks omitted.) *State* v. *Foreshaw*, supra, 214 Conn. 551. Indeed, it is axiomatic that "[t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002).

In determining whether the jury reasonably could have concluded as it did, this court has stated: "[I]t is a function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . If [the] correlation [between the facts and the conclusion] is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation." (Internal quotation marks omitted.) Id., 667–68.

Applying these principles to the facts in the present case, the jury could not reasonably have concluded that the defendant believed that an official proceeding against him was probable when he discarded the evidence. The record reveals that the defendant took off running when a police officer called out to him within minutes of the attempted bank robbery. *State* v. *Jordan*, supra, 135 Conn. App. 638. Even if the defendant believed that the police officer had a description of the alleged bank robber's clothing, there was no evidence that the defendant believed that the police officer knew his identity or had any other information connecting him to the crime. In other words, at that point in time, the clothing was the *only* evidence linking the defendant to the attempted bank robbery. Therefore, it would be unreasonable for the jury to have inferred from the fact that the defendant absconded from the police officer that the defendant believed that an official proceeding against him was probable.

The record also reveals that the police officer chased the defendant past a vehicle, driven by Cordero, that was registered to the defendant. Id., 639, 640. As the defendant ran past the vehicle, he said to Cordero "meet me on the other street, meet me on the other street." (Internal quotation marks omitted.) Id., 639. The defendant's attempt to enlist Cordero's assistance as a getaway driver rather than tell Cordero to flee separately

not only underscores the defendant's intent to avoid detection, but also undermines any inference that he believed that the police would be able to trace the vehicle to him. Accordingly, this fact militates against an inference that the defendant believed an official proceeding against him was probable when he discarded the clothing.

Even if we were to assume, however, that the jury reasonably could have inferred that the defendant knew that the police officer saw him speak to Cordero, the jury would necessarily have to stack inferences based on surmise to conclude that the defendant believed that an official proceeding was probable. To reach this conclusion, the jury had to infer that the defendant believed *at the time he discarded the clothing* that police would apprehend the vehicle, use its contents to ascertain the defendant's identity, and successfully locate and arrest him. Thus, the jury had to infer that the defendant realized *when he discarded the clothing* that the police officer would describe the vehicle to assisting officers, and that the assisting officers would be dispatched to the scene in time to locate and apprehend the vehicle. Beyond that, the jury would have had to infer that the defendant realized *when he discarded the clothing* that the items contained in the vehicle, once in police custody, would lead police to Campbell.[20] And finally, even if all of the foregoing inferences were reasonable, the jury still had to infer that the defendant believed, *when he discarded the clothing*, that Campbell would help the police to locate and arrest the defendant.[21]

Upon the facts favorably construed and the inferences reasonably drawn therefrom, we conclude that the evidence was not sufficient to support the defendant's conviction for tampering with physical evidence in violation of § 53a-155. While we must not substitute our judgment for that of the jury, the reviewing court must determine whether the jury reasonably could have concluded as it did. In the present case, the jury had to speculate to conclude that when the defendant discarded his " 'robber garb' " he believed it was probable that he would be apprehended and arrested for the attempted bank robbery.

Instead, the only reasonable inference from the facts in the present case is that the defendant discarded his clothing to prevent its use in an investigation in order to escape detection and avoid being arrested by the pursuing police officer. There is no evidence that when the defendant discarded the clothing he believed that the police officer had any information, other than the clothing, linking him to the attempted bank robbery. Thus, the defendant discarded the only piece of evidence connecting him to the crime in order to thwart a police investigation that was actively underway. Although the defendant may well have been uncertain

that he would escape detection and avoid arrest, a mere apprehension of being caught does not rise to the level of a subjective belief that an official proceeding is about to be instituted. Indeed, if believing that an official proceeding *might* occur were sufficient under § 53a-155, then conceivably every defendant who discards evidence knowing that a police investigation is underway could be found guilty of evidence tampering, since knowledge of an investigation almost invariably gives rise to apprehension that the investigation *might* progress to an official proceeding. Certainly, the legislature did not intend for the evidence tampering statute to sweep so broadly.

Finally, although we recognize that in certain instances a defendant's intent to keep evidence from the police may support a reasonable inference that the defendant also intends to keep evidence from being used in an official proceeding, the defendant must believe that an official proceeding is probable. The facts in the present case do not support a reasonable inference that, at the time the defendant discarded the clothing, he believed that an official proceeding was probable. Therefore, we conclude that there was insufficient evidence to support the defendant's conviction of tampering with physical evidence under § 53a-155. Accordingly, we reverse the judgment of the Appellate Court with respect to the defendant's conviction under § 53a-155.

The judgment of the Appellate Court is reversed only with respect to the charge of tampering with physical evidence and the case is remanded to that court with direction to remand the case to the trial court with direction to render judgment of not guilty on that charge; the judgment is affirmed in all other respects.

In this opinion McDONALD and ROBINSON, Js., concurred, and ESPINOSA, J., concurred in the result.

[1] General Statutes § 53a-155 (a) provides: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding."

[2] We granted the defendant's petition for certification to appeal limited to the following questions: (1) "Did the Appellate Court properly conclude that the prosecutor's failure to correct the misleading testimony of Herman Cordero and Jennifer Campbell did not deprive the defendant of his due process right to a fair trial?"; and (2) "Should this court overrule its construction of . . . § 53a-155 in *State* v. *Foreshaw*, [supra, 214 Conn. 540]?" *State* v. *Jordan*, 305 Conn. 918, 47 A.3d 388 (2012).

Although the second certified question was limited to whether this court should overrule its construction of § 53a-155 in *Foreshaw*, it is implicit in this question that the defendant is claiming that, under a proper interpretation of § 53a-155, his conduct did not violate that statute. Accordingly, we also consider whether there was sufficient evidence to support the defendant's conviction under § 53a-155 as properly interpreted.

[3] The defendant also made the following three claims: (1) the trial court abused its discretion when it admitted evidence of prior misconduct for the limited purpose of proving the defendant's criminal intent; *State* v. *Jordan*, supra, 135 Conn. App. 644; (2) his due process rights were violated because

the state failed to prove that he intended to use or threatened to use force while committing a larceny; id., 654; and (3) the state did not comply with General Statutes § 54-64e (b) (4), which provides that a defendant shall receive notice that any crime committed while on release may be subject to enhanced penalties. Id., 668–69. The Appellate Court rejected each of these claims; id., 652, 658, 669; and the defendant has not challenged these rulings in this certified appeal.

[4] In reaching this conclusion, the Appellate Court relied on the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). On appeal, both parties agree that, if there is a violation of the standard set forth in *Napue* v. *Illinois*, 360 U.S. 264, 269–71, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), which requires that a prosecutor apprise the court when he or she knows a witness is giving substantially misleading testimony, then this court should apply the *Napue* standard in assessing whether there was harm.

[5] The state concedes in its brief that there is "no dispute" that the relevant testimony in the present case was "potentially misleading . . . ."

[6] The state also raises two alternative grounds for affirmance: (1) the defendant waived his due process claim because he failed to confront Cordero and Campbell with their allegedly false statements at trial; and (2) the Appellate Court improperly concluded that the prosecutor violated the standard set forth in *Napue* v. *Illinois*, 360 U.S. 264, 269–71, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). As we explain in footnote 10 of this opinion, we do not reach these alternative grounds for affirmance because we agree with the state on the certified question.

[7] The Appellate Court determined that while the prosecutor's failure to correct the misleading testimony was improper, the prosecutor's improprieties were harmless. *State* v. *Jordan*, supra, 135 Conn. App. 667. The defendant sought certification on the harmless issue and the state seeks, as an alternative ground for affirmance, a determination that the Appellate Court improperly found prosecutorial improprieties. We agree with the Appellate Court that the alleged improprieties were harmless and thus need not reach the alternative grounds for affirmance. Nevertheless, nothing in this opinion should be construed to suggest that we concur in the Appellate Court's determination that improprieties occurred.

[8] Specifically, Cordero testified that he dropped the defendant off in the parking lot of LaBonne's Supermarket in Watertown, and that the defendant was wearing black jeans and a black jacket but not a face mask, gloves, or a "hoodie." Cordero stated that he waited for ten to fifteen minutes, decided to drive to his house to get some tools to work on the defendant's car, pulled into a cul-de-sac located approximately "a couple hundred feet away from the parking lot," and then decided to turn back so that the defendant would not think he had stolen the car. On his way back, Cordero asserted that he saw a police officer running up the road toward him, but that he had no contact with the defendant at this time.

[9] For instance, there is independent testimony and evidence that the perpetrator had run through a muddy, swampy wooded area and that wet, muddy clothes were found in the motel room in which the defendant's family was staying. In addition, although only Cordero and Campbell testified that the defendant and Cordero were acquainted, it is uncontested that Cordero was in a vehicle registered to the defendant at the time of the crime. Therefore, the existence of a friendship is not necessarily relevant. Moreover, Campbell's testimony that the defendant had urged her to drive away upon seeing police officers outside the motel was duplicative of Detective McKnight's testimony recounting this same event.

[10] We emphasize that the opportunity to impeach is not outcome determinative but, rather, should be evaluated within the context of the strength of the state's case. For instance, in *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 386, the court concluded that, when a witness' testimony was crucial to the state's case, the fact that defense counsel was able to impeach the witness "was not a substitute for cross-examination about the relationship that in fact existed between the leniency that he had been promised and his testimony on behalf of the state." In the present case, however, the state's case was not dependent on the credibility of Cordero or Campbell because there was significant additional testimony and physical evidence of the defendant's guilt. Accordingly, the fact that defense counsel was able to impeach Cordero and Campbell bolsters our conclusion that the defendant was not harmed by the prosecutor's failure to correct their testimony.

[11] The defendant points out that the prosecutor used Campbell's testimony to his benefit during closing argument, relying on *Jenkins* v. *Artuz*, 294

F.3d 284 (2d Cir. 2002). For instance, the prosecutor consistently emphasized that Campbell's testimony "matche[d] up perfectly" with other evidence and that this consistency "bolsters her credibility in other regards . . . [because] [i]f you can rely on the details she gives about those things, you can rely on the details she gives about everything." As we previously have explained, the strength of the state's case and defense counsel's impeachment of Campbell render these statements ultimately harmless. The testimony of all the witnesses who saw the perpetrator and described his clothing, the DNA evidence on that clothing, the wet and muddy clothing found in the motel room of the defendant's family, and the defendant's subsequent evasive actions all provide strong evidence of his guilt. In contrast, in *Jenkins*, the witness at issue "provided the only evidence of motive" and was one of only two witnesses "specifically link[ing]" the defendant to the crime. *Jenkins* v. *Artuz*, supra, 295. Further, "the remaining testimony [for the state] was weak or problematic." Id.

[12] General Statutes § 53a-146 (1) defines " 'official proceeding' " as "any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding."

General Statutes 53a-146 (8) defines " '[p]hysical evidence' " as "any article, object, document, record or other thing of physical substance which is or is about to be produced or used as evidence in an official proceeding."

[13] Foreshaw admitted to having disposed of the gun in her statements to the police and in her testimony, and, thus, the discard element was not at issue. See *State* v. *Foreshaw*, supra, 214 Conn. 543.

[14] Section 53a-155 was enacted as part of "a comprehensive revision of the criminal code that was approved by the legislature in 1969." *State* v. *Salamon*, 287 Conn. 509, 541, 949 A.2d 1092 (2008). This statute, amongst many others in the criminal code, was adopted from the Model Penal Code.

The Model Penal Code provides in relevant part: "A person commits a misdemeanor if, believing that an official proceeding or investigation is pending or about to be instituted, he:

"(1) alters, destroys, conceals, or removes any record, document or thing with purpose to impair its verity or availability in such proceeding or investigation . . . ." 2 A.L.I., Model Penal Code and Commentaries (1980) § 241.7, p. 175.

[15] General Statutes § 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or *about to be instituted*, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." (Emphasis added.)

[16] See footnote 14 of this opinion.

[17] The defendant also relies on several decisions from other states in support of his claim that *Foreshaw* was improperly decided. We are hesitant to adhere to the logic of those decisions, however, as most states' tampering with physical evidence statutes are different from our own. See Model Penal Code and Commentary, supra, § 241.7, comment 1, p. 177 (summarizing differences between tampering with physical evidence statutes). We do observe, however, that most states that have omitted "investigation" from their statutes have interpreted their statutes in a manner consistent with *Foreshaw*. See *Frayer* v. *People*, 684 P.2d 927, 928, 929 (Colo. 1984) (concluding that defendant was guilty of tampering with physical evidence when she threw and broke bottle containing narcotic cough syrup while struggling with police); *Commonwealth* v. *Henderson*, 85 S.W.3d 618, 620 (Ky. 2002) (concluding that defendant was guilty of tampering with physical evidence when he put money from stolen purse in insole of his shoe while being chased by police); *People* v. *Wilkins*, 111 App. Div. 3d 451, 974 N.Y.S.2d 419 (2013) (concluding that defendant was guilty of tampering with physical evidence when defendant discarded "small ziploc bags" while fleeing from police after drug transaction).

[18] Justice Zarella disagrees with our implementation of *Foreshaw*, and would conclude that § 53a-155 does not require the state to present proof of the defendant's prior knowledge of evidence directly connecting him to the crime. We are unable to perceive, however, why a defendant who had no such knowledge would ever "[believe] that an official proceeding is pending, or about to be instituted," as required by § 53a-155.

[19] We also note that this interpretation is consistent with this court's interpretation of a similar statute, § 53a-151, which prevents tampering with witnesses. See *State* v. *Ortiz*, supra, 312 Conn. 568–70; *State* v. *Cavallo*, 200

Conn. 664, 668–69, 513 A.2d 646 (1986).

[20] Campbell testified at trial that on the evening of the attempted robbery, the defendant expressed concerns to her that the police would "connect him and her together because his iPhone, left in the car, contained her first and last name in its directory." *State* v. *Jordan*, supra, 135 Conn. App. 641. This testimony, however, does not support a reasonable inference that the defendant believed that an official proceeding was probable when he discarded the clothing.

The focus of the inquiry for purposes of the evidence is on the defendant's subjective belief and intent at the time he discarded the clothing. The fact that the defendant may have believed *hours after the challenged discard conduct* that police might be able to identify and locate him does not inform the question of whether he believed that an official proceeding was probable *when he discarded the clothing*.

[21] Justice Zarella believes that Campbell's testimony that the defendant had told her that he believed that the police officer who was chasing him assumed that he was the person who had attempted to enter the bank is indicative of the defendant's guilt. We disagree. The evidence supports a conclusion that, while the defendant was still wearing the clothes that linked him to the commission of the crime, Officer McKirryher pursued him until he entered a wooded area. Thus, the most reasonable explanation for the defendant's subsequent removal and discarding of the clothes, which Justice Zarella himself characterizes as "highly identifiable," was that he did so in the hope that, if the police ultimately apprehended him, they would be unable to identify him as the person who had been wearing the clothes.

Justice Zarella also contends that the fact that the defendant spoke to Cordero while running from McKirryher constitutes evidence that he knew that the police had evidence connecting him to the attempted bank robbery. Thus, Justice Zarella contends that the defendant deliberately engaged in conduct—speaking to Cordero—that he *knew* would likely result in his identification as the perpetrator. Again, we disagree. It is far more likely that the defendant spoke to Cordero in the belief that the police officer who was pursuing him at a distance would not notice the brief exchange. Moreover, it would be entirely speculative to conclude that the defendant discarded his clothes mere moments after speaking to Cordero because he believed that Cordero had been caught and had identified him.

Finally, Justice Zarella is left with the argument that the jury reasonably could have found that the defendant believed that he would be identified and arrested for the attempted bank robbery because, instead of simply throwing the items of clothing to the ground, he hid them. Again, however, it would be entirely speculative to conclude that the defendant intentionally "hid" the clothes in a trash can and in the Desantises' carport, instead of simply discarding them there. Indeed, the record does not establish that it was the defendant who placed the jacket in the trash can where it was found two days after the defendant discarded it. It is entirely possible that someone in the neighborhood found the discarded jacket and placed it there.

With respect to the evidence of the defendant's conduct *after* he discarded the clothing, we acknowledge that the evidence showing that he did not go home, but stayed at a motel under an assumed name would support a conclusion that, by that time, approximately four hours after the attempted robbery, the defendant's inability to reach Cordero by telephone had given rise to a concern that the police had identified him as the perpetrator. The fact that the defendant was concerned that Cordero may have been stopped by the police *at that time* does not support a reasonable inference, however, that he had such a concern mere minutes after speaking to Cordero.